**RICHLAND STATE BANK, a South Dakota Chartered Bank; and Ronald L. Jensen, Plaintiffs,**

v.

**HOUSEHOLD CREDIT SERVICES, INC., a Delaware corporation, Defendant.**

No. CIV. 02–4180.

United States District Court,
D. South Dakota,
Southern Division.

Sept. 30, 2004.

Roberto A. Lange, Davenport, Evans, Hurwitz & Smith, Sioux Falls, SD, for Plaintiffs.

Michael A. Henderson, Steven W. Sanford, Cadwell, Sanford, Deibert & Garry, Sioux Falls, SD, for Defendant.

## SUMMARY JUDGMENT MEMORANDUM OPINION AND ORDER

PIERSOL, Chief Judge.

Plaintiffs' second amended complaint alleged causes of action for breach of contract, negligence and tortious interference with business, as well as requested declaratory judgment relief regarding a contractual provision. Doc. 47. On October 15, 2003. Defendant moved for summary judgment on all counts of Plaintiffs' second amended complaint. Doc. 61. At a pretrial conference hearing on January 5, 2004, the Court heard argument on the motion for summary judgment. Plaintiffs subsequently filed a third amended complaint, in which they have added a cause of action for fraud and deceit. Doc. 88. Defendant then submitted a second motion for summary judgment requesting summary judgment in its favor on the fraud and deceit cause of action. Doc. 93.

## FACTUAL BACKGROUND

Since this matter is before the Court on motions for summary judgment, this Court will view the facts in the light most favorable to the nonmoving party. Plaintiff Richland State Bank is a South Dakota Bank with its principal place of business in Bruce, South Dakota. Since 1995, Plaintiff Ronald Jensen has been its sole shareholder. Richland State Bank issued MasterCard credit cards on new accounts in the sub-prime credit card market (the Richland Portfolio) from November of 1997 until June of 1999. The Richland Portfolio was a cross-sell portfolio offered only to the best cardholders in a sub-prime portfolio called the AFCA portfolio. The AFCA portfolio was owned by a separate business called UCNB, which also owned the ACE Portfolio. The Richland Portfolio performed better than the AFCA portfolio.

Richland State Bank was a credit card issuing bank, but was not a servicer. Until Defendant assumed the servicing contract, a business called Specialized Card Services, Inc. (SCS) performed account servicing under the Richland/SCS Service Agreement. SCS also serviced the AFCA portfolio. In 2000, the owner of the AFCA portfolio had problems with the Office of Comptroller of Currency (OCC), and the Richland Portfolio had problems with the FDIC. The FDIC issued a cease and de-

sist order in February of 2000, and lifted the same in the fall of 2000. UCNB agreed with the OCC to sell its credit card business, including the AFCA and ACE portfolios.

Defendant Household Credit Services, Inc. (HCS) is in the business of owning both prime and sub-prime credit card portfolios. Defendant bought the AFCA portfolio at 72.5% of par, and wanted to buy the Richland Portfolio. Defendant had discussed offering 77% to 80% of par for the Richland portfolio in the summer of 2000. On August 4, 2000, HCS entered into a contract with UICI, a publicly traded company, to purchase the assets of SCS. As part of that agreement, Defendant agreed to service the Richland State Bank accounts for a period of one year following the closing. Although Defendant did not really want to service the Richland Portfolio, according to the project manager of Defendant HCS, it committed to servicing the Richland Portfolio as an avenue to purchase the portfolio.

On September 20, 2000, Ronald Jensen entered into a contract to sell the Richland State Bank for book value to Bryan Mitchell. The purchase price included the payment of book value for the Richland Portfolio. The closing was to occur at the end of 2000. Plaintiffs contend that the asset value of the Richland Portfolio was around 87% of par at that time. The project manager of Defendant HCS called a person affiliated with Bryan Mitchell to seek to keep the Richland Portfolio off the market, so that Defendant HCS could have an opportunity to acquire the portfolio.

Both SCS and then Defendant were required to comply with the Fair Debt Collection Practices Act in servicing the Richland Portfolio. Neither were properly licensed to comply with the Fair Debt Collection Practices Act. On September 25, 2000, the President of the Richland State Bank was advised that Defendant wanted the Richland cards out by the end of the month. When the President of Richland contacted Defendant HCS, he was advised that HCS had a solution—it would outsource collections to LTD. LTD was not a subcontractor of Richland State Bank. Rather, Defendant HCS was the client of LTD on the performance of collections on the Richland Portfolio.

Plaintiffs have submitted evidence that no information was provided to LTD concerning the historical performance of the Richland Portfolio, and that LTD received no initial criteria or performance expectations. In addition, the collectors were all paid the same monthly salary without additional incentives. Plaintiffs have presented evidence that the collectors assigned to the Richland Portfolio were of inferior quality whose positions were terminated because of job abandonment, incarceration, lack of production, and insubordination. Plaintiffs contend that few, if any collection calls were made, and operational problems were not remedied. The Richland Portfolio turned unprofitable in the fall of 2000, Plaintiffs contend, as a result of substandard collections. Although the Richland Portfolio had historically outperformed the AFCA Portfolio, the Richland Portfolio's performance fell well below the AFCA Portfolio.

On December 19, 2000, Defendant HCS faxed an offer for the Richland portfolio at 48% of par. Bryan Mitchell received a fax of the Defendant's offer, and immediately backed out of the Stock Purchase Agreement for the Richland State Bank. The termination letter explained, "As a result of the Household offer and the deteriorating performance of the Richland portfolio since we signed the Agreement, we will not acquire the Bank with the credit card portfolio in it at any price." Richland State Bank them made a demand on Ronald Jensen to buy the sub-prime credit

card portfolio receivables at 72.5% of par. Jensen arranged such a purchase by Winn Investors, L.L.C.. After the performance continued to deteriorate, Jensen arranged for Specialized Investments Risks. Ltd., an entity owned by Jensen, to purchase the Richland Portfolio.

The Richland /SCS Service Agreement contained the following clause:

> 16. *Limitation on Damages.* In the event that SCS is found liable for any material errors in processing or servicing Institutions's accounts, SCS will only be liable for the amount of the transactions and for the timely correction of any errors or breach of service. In the event of such processing or servicing errors SCS shall not be liable for any penalties or damages including but not limited to anticipated and unanticipated damages, attorney's fees, and costs of collection, and under no circumstances shall SCS be liable for lost profits or for special, consequential, punitive or exemplary damages.

In a second amendment to the Richland/SCS Service Agreement, HCS was substituted for SCS. Other changes were made to the Service Agreement, but paragraph 16 remained the same.

## DISCUSSION

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). In ruling on a motion for summary judgment, the Court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts. *AgriStor Leasing v. Farrow,* 826 F.2d 732, 734 (8th Cir.1987). The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Once the moving party has met its burden, the non-moving party may not rest on the allegations of its pleadings but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. Fed.R.Civ.P. 56(e); *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505; *City of Mt. Pleasant v. Associated Elec. Coop., Inc.,* 838 F.2d 268, 273–74 (8th Cir. 1988). Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### ISSUES

### I.

### WHETHER THE CONTRACT IS UNENFORCEABLE BECAUSE IT IS UNLAWFUL?

Defendant contends that since the Plaintiffs knew months before HCS took over the SCS contract that SCS was violating the law by engaging in third party collections without appropriate state license, the contract with HCS, who also is not licensed to engage in third party collections, was void as a contract that requires a party to violate a law. In support of its position, Defendant cites to S.D.C.L. § 53–9–1, which provides that a "contract provi-

sion contrary to an express provision of law or to the policy of express law ... is unlawful." Defendant also relies on S.D.C.L. § 20–2–2 which provides that the a "condition in a contract, the fulfillment of which is impossible or unlawful, ... is void."

Plaintiffs rely on the principle that contracts are to be construed to carry out valid contractual relations rather than be construed so as to render them invalid or impossible to perform. *See Thunderstik Lodge, Inc. v. Reuer*, 613 N.W.2d 44, 48 (S.D.2000). In addition, the possibility of performing a contract in an illegal manner will not render the contract unenforceable as contrary to public policy where the illegality does not appear on the face of the contract. *Michigan Millers Mut. Fire Ins. Co. v. Canadian Northern Ry. Co.*, 152 F.2d 292 (8th Cir.1945). The contract in this case could be performed, and was performed legally, by outsourcing collections.

Plaintiffs also contend that this is more of a case of impossibility or commercial frustration, as opposed to illegality. If that is the case, Defendant is not excused from performance because it has assumed the risk of its own inability to perform. Even if the party relies on a third party for performance, the party has also undertaken the risk that the third party will not adequately perform, and cannot be discharged from the contract because of the third party's nonperformance. *See Groseth Int'l v. Tenneco, Inc.*, 410 N.W.2d 159, 167 (S.D.1987). Section 9.9 of the August 4, 2000, asset purchase and transfer agreement provides:

> For a period of one (1) year following the Closing Date, HCS will provide such services upon such terms and conditions (and shall not exercise its right of termination other than for cause) as are set forth in the Financial Institution Servicing Agreement, dated May 9, 1996, as amended by the Richland Servicing Agreement Amendment ....

HCS clearly assumed the obligation to service the Richland account for the year following the closing date. Documentation exists that by August 10, 2000, HCS's project leader on the Richland portfolio acquisition was researching the third party collection issue to determine if HCS would outsource the Richland account. For purposes of summary judgment, HCS cannot avoid responsibility for the selection and supervision of LTD for collection of the Richland account. Since the contract was capable of and was, in fact, performed in a legal manner, the contract cannot be deemed unenforceable due to illegality or impossibility.[1]

## II.

### WHETHER THE LIMITATION ON DAMAGES CLAUSE IS ENFORCEABLE ?

In their request for declaratory relief and in their resistance to the motion for summary judgment, Plaintiffs have requested the Court to limit the application of Section 16 (Limitation on Damages) of the Service Agreement to apply only to such errors as posting the wrong amount of payment or posting to the wrong account, and not to apply it to breaches of contract by failing to ensure proper collections. Plaintiffs also rely on Sections 15.1, 15.2, and 20 of the Service Agreement as support for their position that the limitation of damages does not apply to their

---

1. Since the Court has determined that this case does not present an illegal contract, the Court need not address whether an illegal service agreement should still be enforced pursuant to Restatement (Second) of Contract § 178, based on Plaintiffs' justified expectations.

breach of contract claim. Section 15.1 defines claims as "any and all losses, liabilities, claims and expenses, including attorney's fees." Section 15.2 provides that HCS shall indemnify Richland Bank from all claims. Section 20 provides that the prevailing party shall be entitled to attorney fees in an action or appeal to enforce any provision of the servicing agreement. Plaintiffs contend that they must be able to receive damages for breach of contract so as to give effect to these provisions of the contract.

■■■ The Service Agreement designates the laws of the State of South Dakota as the governing law in the interpretation of the contract. The South Dakota Supreme Court has set forth its general principles of contract interpretation as follows:

> In interpreting a contract, we seek to ascertain and give effect to the intention of the parties; at the same time, to find the intention of the parties we rely on the contract language they actually used. *Malcolm v. Malcolm,* 365 N.W.2d 863, 865 (S.D.1985). ... It is a fundamental rule of contract interpretation that the entire contract and all its provisions must be given meaning if that can be accomplished consistently and reasonably. [*Dail v. Vodicka,* 89 S.D. 600, 603, 237 N.W.2d 7, 9 (1975)] However, when provisions conflict and full weight cannot be given to each, "the more specific clauses are deemed to reflect the parties intentions-a specific provision controls a general one." *State v. Greger,* 1997 SD 14, 21, 559 N.W.2d 854, 864. Ordinarily, the plain meaning of the contract language will be followed unless there is some ambiguity or different intent manifested. *American State Bank v. Adkins,* 458 N.W.2d 807, 809 (S.D.1990).

*Prunty Const., Inc., v. City of Canistota,* 682 N.W.2d 749, 756 (S.D.2004)(*quoting*

*Carstensen Contracting, Inc. v. Mid–Dakota Rural Water Sys., Inc.,* 653 N.W.2d 875, 877 (S.D.2002)).

■■■ The interpretation of the Limitation on Damages clause advanced by Plaintiffs to restrict the clause to posting errors ignores the plain language of the contract section applying the limitations on damages provision to liability for "any material errors in processing or servicing" Richland's accounts. This Court also rejects Plaintiffs' position that they must be able to receive damages for breach of contract and negligence so as to give effect to the indemnification and attorney fees provisions of the service agreement.

Indemnify means "to make reimbursement to one of a loss already sustained by him." *Black's Law Dictionary* 769 (6th ed.1990). The indemnification provisions are not inconsistent with the Limitation on Damages clause. Moreover, if there were any conflict in these provisions, the more specific terms of the Limitation on Damages clause would prevail. *See State v. Greger,* 559 N.W.2d 854, 864 (S.D.1997).

■■■ Plaintiffs further contend that the limitations of damages section should not be enforced because it is unconscionable. Although Plaintiffs rely on *Durham v. Ciba–Geigy Corp.,* 315 N.W.2d 696 (S.D. 1982), that case is factually distinguishable from the one at hand. The basis of the *Durham* holding is that the purchasers of pesticides are not in a position to bargain with chemical manufacturers for contract terms more favorable than those listed on the pre-printed label. The bargaining power of Richland Bank was far different. It negotiated the original agreement, then modified the same, yet left paragraph 16 intact. Although freedom of contract is not absolute, *see Hieb v. Opp,* 458 N.W.2d 797, 801 (S.D.1990), Plaintiffs have failed to identify any policy concerns to justify abridging freedom of

contract in the case at hand. *See Computrol, Inc., v. Newtrend, L.P.,* 203 F.3d 1064, 1070 (8th Cir.2000)(basis for enforcement of limitation of liability clause is strong public policy favoring freedom of contract). Consistent with the "processing or servicing error" language of the Limitation on Damages clause, any recovery Plaintiffs may receive on their breach of contract and negligence causes of action will be limited by the terms of the clause where those damages were caused by processing or servicing errors. The Limitation on Damages clause will not be applicable to any damages that might be awarded for tortious interference with business and fraud and deceit claims.

## III.

### WHETHER PLAINTIFFS ARE BARRED FROM RECOVERING ON THEIR NEGLIGENCE CLAIM BECAUSE OF CONTRIBUTORY NEGLIGENCE?

Defendant contends that Plaintiffs are barred from recovering on their negligence cause of action because, as Defendant alleges, Richland had the opportunity and obligation to prevent LTD's poor collection efforts. Questions of contributory negligence, however, are for the jury and inappropriate for resolution by summary judgment in all but the rarest of cases. *Pettry v. Rapid City Area Sch. Dist.,* 630 N.W.2d 705, 708 (S.D.2001). The issue of whose conduct caused the alleged damages is a jury question, and the request for summary judgment on the basis of contributory negligence will be denied.

## IV.

### WHETHER HCS IS ENTITLED TO SUMMARY JUDGMENT ON THE TORTIOUS INTERFERENCE WITH BUSINESS CLAIM?

The tort of tortious interference with valid business relationship or expectancy has the following elements:(1) existence of valid business relationship or expectancy, (2) knowledge by interferer of relationship or expectancy, (3) intentional and unjustified act of interference on part of interferer, (4) proof that interference caused harm sustained, and (5) damage to party whose relationship or expectancy was disrupted. *Table Steaks v. First Premier Bank, N.A.,* 650 N.W.2d 829 (S.D. 2002). Plaintiffs have submitted evidence that Mitchell had contracted to buy the bank stock for book value. HCS was aware of the relationship between Plaintiffs and Mitchell. Plaintiffs have submitted evidence that HCS wanted to acquire the Richland portfolio, and Plaintiffs have submitted evidence sufficient to support the inference that the supervision of the outsourcing was designed to harm the performance of the Richland portfolio. In addition, Mitchell ultimately received the December 19, 2000, faxed offer from HCS for the purchase of the Richland portfolio at 48% of par.

The September 20, 2000, agreement for the purchase of the purchase of the bank stock contemplated the buyer being able to withdraw its offer if the value of the stock changed from the time of the making of the Agreement. Mitchell's attorney partner, John Michener has testified as follows regarding the impact of the faxed HCS offer:

[Question]: What effect did the timing and the amount of the Household offer have on that agreement between Mr. Mitchell and Mr. Jensen?

[Answer]: We immediately realized we would not want to acquire the bank under any circumstances.

[Question]: Why is that?

[Answer]: Because the—it's a two-fold deal. One, the bank would be left with minimal book value, if any. With a 10 percent reserve in taking a 52

percent discount, roughly 40 percent of the 10 and a half million dollar portfolio, for approximately four and a half million would disappear from the balance sheet.

The December 20, 2000, letter from Michener to Plaintiff Jensen states:

> This decision [to terminate the agreement to purchase the Richland Bank stock] has been made because of the difference in the book value of the Bank's credit card portfolio and the offer for said portfolio made by Household yesterday.... [O]ur first inquiries indicated that the portfolio would fetch a price in excess of the 72.5% paid by Household for the UCNB portfolio. Both Dave Huddleston and Tim Percell indicated to us that the Richland cards deserved a premium price over the UCNB portfolio. In November Household said they preferred to see the November results before making an offer for the portfolio and that if pressed to make an offer before the end of November the offer would only be 65%. A week ago last Friday, we were advised by Household that the offer would only be 53%. Last week we were told 50% and yesterday, the first time we had a written offer, Household only offered 48%.

The Plaintiffs contend that the conduct of HCS has resulted in loss and damages arising from the failure of the agreement for the purchase of the Richland Bank stock to close and the diminution in the value of the Richland portfolio.

HCS contends that its failure to supervise LTD is merely negligent conduct. It also claims that since no other potential purchaser would make any offer, its offer or statement that it would be interested in making the offer of purchasing the Richland portfolio at 48% of par cannot be characterized as making a "low ball," offer, and cannot expose it to a claim of interfer-ence because it had no duty to make any offer. These arguments and the evidence Defendant HCS cites to in support of its arguments raise an issue of fact regarding its intent in supervising LTD and communicating to Mitchell's representative its offer or statement that it would be interested in making the offer of purchasing the Richland portfolio at 48% of par.

⬛ When a party's intent is at issue, summary judgment must be granted with caution, since such issues of intent raise question to be determined by a factfinder. *See United States v. One 1989 Jeep Wagoneer,* 976 F.2d 1172, 1176 (8th Cir.1992). Plaintiffs have submitted evidence sufficient to survive summary judgment on the tortious interference with business claim.

### V.

### WHETHER DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' FRAUD AND DECEIT CLAIM?

In their third amended complaint, Plaintiff asset a cause of action for fraud and deceit. Plaintiffs allege that at the time Defendant entered into the August 4, 2000, contract to purchase the assets of SCS and agreed to service the Richland State Bank accounts, Defendant did not want to service the Richland State Bank but left that fact "[u]nbeknownst to Richland State Bank at the time." Plaintiffs also allege that Defendant agreed to service the Richland portfolio when its motive was not to provide servicing but to position itself to acquire the Richland portfolio inexpensively. Plaintiffs further contend that contrary to what it was supposed to do, Defendant did not properly service the Richland portfolio between late September of 2000 and February of 2001.

■ The South Dakota Supreme Court has set forth the essential elements of deceit as follows:

> [T]hat a representation was made as a statement of fact, which Was untrue and known to be untrue by the party making it, or else recklessly made; that it was made with the intent to deceive and for the purpose of inducing the other party to act upon it; and that he did in fact rely on it and was induced thereby to act to his injury or damage.

*Grynberg v. Citation Oil & Gas Corp.*, 573 N.W.2d 493, 502 (S.D.1997)(*citing Holy Cross Parish v. Huether*, 308 N.W.2d 575, 576 (S.D.1981)); *See also,* S.D.C.L. § 20–10–1.[2]

■ "Questions of fraud and deceit are generally questions of fact and as such are to be determined by the jury." *Sporleder v. Van Liere*, 569 N.W.2d 8, 11 (S.D. 1997), *quoted in Fritzmeier v. Krause Gentle Corp.*, 669 N.W.2d 699, 705 (S.D. 2003). Inherent in every contract is the covenant of good faith and fair dealing. *See Prunty Construction,* 682 N.W.2d at 760. When HCS was substituted for SCS in the Richland/SCS Service Agreement, it was subject to the implied covenant of good faith and fair dealing. On September 18, 2000, when advised that Jensen was close to selling the Richland portfolio for book value, a representative of HCS expressed the sentiment that HCS was "feeling a bit snookered," but "[o]bviously, if we have an obligation we will live up to it." A jury question exists as to whether HCS is liable for fraud and deceit for conduct that occurred once it agreed to service the Richland Portfolio.

■ The Court concludes, however, that Defendant is entitled to summary judgment of the fraud and deceit cause of action to the extent that Plaintiffs seek to hold HCS liable for failing to disclose its true intent when negotiating the August 4, 2000, contract to purchase the assets of SCS and service the Richland State Bank accounts. The South Dakota Supreme Court has stated, "This Court has never imposed a duty to disclose information on parties to an arm's-length business transaction absent an employment or fiduciary relationship." *Taggart v. Ford Motor Credit Co.*, 462 N.W.2d 493, 499 (S.D.1990)(*citing Voeller v. Geisler*, 77 S.D. 96, 86 N.W.2d 395 (1957)). Richland State Bank was not even a party to the negotiations that preceded the August 4, 2000, contract. Furthermore, the fact that an ongoing relationship between HCS and Richland was contemplated in the agreement did not render the relationship between HCS and Plaintiffs a fiduciary one so as to obligate HCS to disclose its intent during contract negotiations. *Taggart,* 462 N.W.2d at 500. Accordingly,

IT IS ORDERED:

1. that Defendant's Motion for Summary Judgment (Doc. 61) is granted to the extent that any recovery Plaintiffs may receive on their breach of contract and negligence causes of action will be limited by the terms of the Limitation on Dam-

---

**2.** A deceit within the meaning of S.D.C.L. § 20–10–1 is further defined in S.D.C.L. § 20–10–2 as either:

(1) The suggestion, as a fact, of that which is not true, by one who does not believe it to be true.

(2) The assertion, as a fact, of that which is not true, by one who has reasonable ground for believing it to be true;

(3) The suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or

(4) A promise made without any intention of performing.

ages clause, but the motion is otherwise denied.

2. that Defendant's Second Motion for Summary Judgment (Doc. 93) is granted to the extent that Plaintiffs seek to hold HCS liable for fraud and deceit for failing to disclose its true intent when negotiating the August 4, 2000, contract to purchase the assets of SCS and service the Richland State Bank, but the Second Motion for Summary Judgment is otherwise denied.